47 A.3d 12

IN THE MATTER OF THE ESTATE OF RICHARD
D. EHRLICH, DECEASED.

Superior Court of New Jersey
Appellate Division

Argued April 23, 2012—Decided June 29, 2012.

66

Before Judges PARRILLO, ALVAREZ and SKILLMAN.

*Ethan J. Ordog* argued the cause for appellants/cross-respondents Todd Ehrlich and Pamela A. Venuto (*Begley Law Group, P.C.*, attorneys; *Mr. Ordog*, of counsel and on the brief).

*Paul R. Melletz* argued the cause for respondent/cross-appellant Jonathan Ehrlich (*Begelman, Orlow & Melletz*, attorneys; *Mr. Melletz*, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

Appellants Todd Ehrlich and Pamela Venuto appeal from an April 20, 2011 order of the General Equity Part admitting into probate the proffered Will of Richard D. Ehrlich and from the June 20, 2011 order denying their motion for reconsideration. Respondent Jonathan Ehrlich cross-appeals from the July 6, 2011 order denying his motion for sanctions under the Frivolous Litigation statute, *N.J.S.A.* 2A:15–59.1. We affirm.

The material facts are not genuinely in dispute. Richard Ehrlich, a trust and estates attorney who practiced in Burlington County for over fifty years, died on September 21, 2009. His only next of kin were his deceased brother's children—Todd and Jonathan Ehrlich and Pamela Venuto. The decedent had not seen or had any contact with Todd or Pamela in over twenty years. He did, however, maintain a relationship with Jonathan, who, he had told his closest friends as late as 2008, was the person to contact if he became ill or died, and to whom he would leave his estate.

Jonathan learned of his uncle's death nearly two months after the passing. An extensive search for a Will followed. As a result, Jonathan located a copy of a purported Will in a drawer near the rear entrance of decedent's home, which, like his office, was full of clutter and a mess. Thereafter, on December 17, 2009, Jonathan filed a verified complaint seeking to have the document admitted to probate. His siblings, Todd and Pamela, filed an answer, objecting. The court appointed a temporary administrator, Dennis P. McInerney, Esquire, who had been previously named as Trustee of decedent's law practice, and by order of June 23, 2010, directed, among other things, an inspection of decedent's home. Pursuant to that order, on July 8, 2010, Jonathan, Todd and Pamela, along with counsel and McInerney, accessed and viewed the contents of decedent's home and law office. No other document purporting to be decedent's Will was ever located.

The document proffered by Jonathan is a copy of a detailed fourteen-page document entitled "Last Will and Testament." It was typed on traditional legal paper with Richard Ehrlich's name and law office address printed in the margin of each page. The document does not contain the signature of decedent or any witnesses. It does, however, include, in decedent's own handwriting, a notation at the right-hand corner of the cover page: "Original mailed to H.W. Van Sciver, 5/20/2000[.]" The document names Harry W. Van Sciver as Executor of the purported Will and Jonathan as contingent Executor. Van Sciver was also named Trustee, along with Jonathan and Michelle Tarter as contingent Trustees. Van Sciver predeceased the decedent and the original of the document was never returned.

In relevant part, the purported Will provides a specific bequest of $50,000 to Pamela and $75,000 to Todd. Twenty-five percent of the residuary estate is to pass to a trust for the benefit of a friend, Kathryn Harris, who is to receive periodic payments therefrom. Seventy-five percent of the residuary estate is to pass to Jonathan.

It is undisputed that the document was prepared by decedent and just before he was to undergo life-threatening surgery. On

the same day this purported Will was drafted—May 20, 2000—decedent also executed a Power of Attorney and Living Will [1], both witnessed by the same individual, who was the Burlington County Surrogate. As with the purported Will, these other documents were typed on traditional legal paper with Richard Ehrlich's name and law office address printed in the margin of each page.

Years after drafting these documents, decedent acknowledged to others that he had a Will and wished to delete the bequest to his former friend, Kathryn Harris, with whom he apparently had a falling out. Despite his stated intention, decedent never effectuated any change or modification to his Will as no such document ever surfaced, even after the extensive search conducted of his home and law office after his death.

The contested probate matter proceeded on cross-motions for summary judgment following completion of discovery. After hearing argument, the General Equity Judge granted Jonathan's motion and admitted the copy entitled "Last Will and Testament" of Richard Ehrlich to probate. The court reasoned:

> First, since Mr. [Richard] Ehrlich prepared the document, there can be no doubt that he viewed it. Secondly, while he did not formally execute the copy, his hand written notations at the top of the first page, effectively demonstrating that the original was mailed to his executor on the same day that he executed his power of attorney and his health directive is clear and convincing evidence of his "final assent" that he intended the original document to constitute his last will and testament as required both by *N.J.S.A.* 3B:3–3 and [*In re Probate of Will and Codicil of Macool,* 416 *N.J.Super.* 298, 310, 3 *A.*3d 1258 (App.Div.2010) ].

The judge later denied Jonathan's motion for sanctions for frivolous litigation.

This appeal and cross-appeal follow.

I

At issue is whether the unexecuted copy of a purportedly executed original document sufficiently represents decedent's final

---

[1] Jonathan is named the alternate agent to make health care decisions in the event his uncle became incapacitated and the primary agent was unavailable.

testamentary intent to be admitted into probate under *N.J.S.A.* 3B:3–3. Since, as the parties agree, there is no genuine issue of material fact, the matter was ripe for summary judgment as involving only a question of law, *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 529, 666 *A.*2d 146 (1995); *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 75, 110 *A.*2d 24 (1954), to which we owe the motion court no special deference. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

*N.J.S.A.* 3B:3–2 contains the technical requirements for writings intended as wills:

a. Except as provided in subsection b. and in *N.J.S.[A.]* 3B:3–3, a will shall be: (1) in writing;

(2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and at the testator's direction; and

(3) signed by at least two individuals, each of whom signed within a reasonable time after each witnessed either the signing of the will as described in paragraph (2) or the testator's acknowledgment of that signature or acknowledgment of the will.

b. A will that does not comply with subsection a. is valid as a writing intended as a will, whether or not witnessed, if the signature and material portions of the document are in the testator's handwriting.

c. Intent that the document constitutes the testator's will can be established by extrinsic evidence, including for writings intended as wills, portions of the document that are not in the testator's handwriting.

A document that does not comply with the requirements of *N.J.S.A.* 3B:3–2a or b is nevertheless valid as a document intended as a Will and may be admitted into probate upon satisfaction of *N.J.S.A.* 3B:3–3, which provides:

Although a document or writing added upon a document was not executed in compliance with *N.J.S.[A.]* 3B:3–2, the document or writing is treated as if it had been executed in compliance with *N.J.S.[A.]* 3B:3–2 if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute: (1) the decedent's will. . . .

The Legislature enacted *N.J.S.A.* 3B:3–3 in 2004, as an amendment to the New Jersey Probate Code. *L.* 2004, *c.* 132, § 10, eff. Feb. 27, 2005. It is virtually identical to Section 2–503 of the Uniform Probate Code (UPC), upon which it was modeled. Senate Judiciary Committee, *Statement to Senate Bill No. 708*, enact-

ed as *L.* 2004, *c.* 132 (reprinted after *N.J.S.A.* 3B:1–1).[2] The comments to that Section by the National Conference of Commissioners on Uniform State Laws express its clear purpose: "[s]ection 2–503 means to retain the intent-serving benefits of Section 2–502 formality without inflicting intent-defeating outcomes in cases of harmless error." *Unif. Probate Code,* cmt. on § 2–503. Of particular note, the Commissioners' comments state that Section 2–503 "is supported by the *Restatement (Third) of Property: Wills and Other Donative Transfers* § 3.3 (1999)." Recognizing that strict compliance with the statutory formalities has led to harsh results in many cases, the comments to the Restatement explain,

... the purpose of the statutory formalities is to determine whether the decedent adopted the document as his or her will. Modern authority is moving away from insistence on strict compliance with statutory formalities, recognizing that the statutory formalities are not ends in themselves but rather the means of determining whether their underlying purpose has been met. A will that fails to comply with one or another of the statutory formalities, and hence would be invalid if held to a standard of strict compliance with the formalities, may constitute just as reliable an expression of intention as a will executed in strict compliance.

. . . .

The trend toward excusing harmless errors is based on a growing acceptance of the broader principle that mistake, whether in execution or in expression, should not be allowed to defeat intention nor to work unjust enrichment.

[*Restatement (Third) of Property,* § 3.3 cmt. b (1999).]

We recently had occasion to interpret *N.J.S.A.* 3B:3–3 in a case wherein we held that under New Jersey's codification of the "harmless error" doctrine, a writing need not be signed by the testator in order to be admitted to probate. *In re Probate of Will and Codicil of Macool,* 416 *N.J.Super.* 298, 311, 3 *A.*3d 1258 (App.Div.2010).

---

2 Section 2–503 of the UPC provides in pertinent part:

Although a document or writing added upon a document was not executed in compliance with Section 5–502, the document or writing is treated as if it had been executed in compliance with that Section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute (i) the decedent's will. . . .

[T]hat for a writing to be admitted into probate as a will under *N.J.S.A.* 3B:3-3, the proponent of the writing intended to constitute such a will must prove, by clear and convincing evidence, that: (1) the decedent actually reviewed the document in question; and (2) thereafter gave his or her final assent to it. Absent either one of these two elements, a trier of fact can only speculate as to whether the proposed writing accurately reflects the decedent's final testamentary wishes.

[*Id.* at 310, 3 *A.*3d 1258.]

Thus, *N.J.S.A.* 3B:3-3, in addressing a form of testamentary document not executed in compliance with *N.J.S.A.* 3B:3-2, represents a relaxation of the rules regarding formal execution of Wills so as to effectuate the intent of the testator. This legislative leeway happens to be consonant with "a court's duty in probate matters . . . 'to ascertain and give effect to the probable intention of the testator.'" *Macool, supra,* 416 *N.J.Super.* at 307, 3 *A.*3d 1258 (quoting *Fidelity Union Trust v. Robert,* 36 *N.J.* 561, 564, 178 *A.*2d 185 (1962)) (internal citations and quotation marks omitted in original). As such, Section 3 dispenses with the requirement that the proposed document be executed or otherwise signed in some fashion by the testator. *Macool, supra,* 416 *N.J.Super.* at 311, 3 *A.*3d 1258.

Our dissenting colleague, who participated in *Macool,* retreats from its holding and now discerns a specific requirement in Section 3 that the document be signed and acknowledged before a court may even move to the next step and decide whether there is clear and convincing evidence that the decedent intended the document to be his Will, and therefore excuse any deficiencies therein. We find no basis for such a constrictive construction in the plain language of the provision, which in clear contrast to Section 2, expressly contemplates an unexecuted Will within its scope. Otherwise what is the point of the exception?

■ Because *N.J.S.A.* 3B:3-3 is remedial in nature, it should be liberally construed. *See Singleton v. Consolidated Freightways Corp.,* 64 *N.J.* 357, 362, 316 *A.*2d 436 (1974). Indeed, if the Legislature intended a signed and acknowledged document as a condition precedent to its validation under Section 3, it would have, we submit, declared so expressly as did, for instance, the Colorado Legislature in enacting its version of UPC § 2–503 and

*N.J.S.A.* 3B:3–3.[3] The fact that the Legislature chose not to qualify its remedial measure as the dissent suggests is also consistent with the Commissioners' commentary expressly citing those foreign jurisdictions that excuse non-compliance with the signature requirement, although "reluctant[ly]" so. *Unif. Probate Code*, cmt. on § 2–503. And like the Commissioners' discussion, the comments to the Restatement also acknowledge that the absence of a signature is excusable, albeit the "hardest" deficiency to justify as it raises serious, *but not insuperable* doubt." *Restatement (Third) of Property*, § 3.3 cmt. b (1999) (emphasis added).

To be sure, as a general proposition, the greater the departure from Section 2's formal requirement, the more difficult it will be to satisfy Section 3's mandate that the instrument reflect the testator's final testamentary intent. And while the dissent's concern over the lack of a signature and attestation is obviously understandable, their absence in this instance, as recognized by both sets of commentators and the express wording of Section 3, does not present an insurmountable obstacle.

---

[3] Colorado Revised Statute 15–11–503(1), which is modeled after Section 2–503 of the U.P.C., is identical to *N.J.S.A.* 3B:3–3. However, unlike *N.J.S.A.* 3B:3–3, Colorado's statute contains an additional subsection, which states that

Subsection (1) of this Section shall apply only if the document is signed or acknowledged by the decedent as his or her will or if it is established by clear and convincing evidence that the decedent erroneously signed a document intended to be the will of the decedent's spouse.
[Col.Rev.Stat. 15–11–503(2).]

Montana's counterpart, on the other hand, contains no such qualification and is identical to *N.J.S.A.* 3B:3–3. Mont.Code Ann. § 72–2–523. In interpreting this provision, Montana courts have not imposed requirements that the will either be signed or acknowledged by the decedent before applying the harmless error doctrine. Rather, the proponent simply must show that "the document establishes by clear and convincing evidence that the decedent intended the document to be the decedent's will." *In re Estate of Hall*, 310 *Mont.* 486, 51 *P.*3d 1134, 1135 (2002). And, according to the Montana Supreme Court, "there is no definite fixed rule for determining testamentary intent, but each case must stand on its own particular facts and circumstances." *In re Estate of Johnson*, 313 *Mont.* 316, 60 *P.*3d 1014, 1017 (2002).

Instead, to overcome the deficiencies in formality, Section 3 places on the proponent of the defective instrument the burden of proving by clear and convincing evidence that the document was in fact reviewed by the testator, expresses his or her testamentary intent, and was thereafter assented to by the testator. In other words, in dispensing with technical conformity, Section 3 imposes evidential standards and safeguards appropriate to satisfy the fundamental mandate that the disputed instrument correctly expresses the testator's intent.

█ Here, as noted, decedent undeniably prepared and reviewed the challenged document. In disposing of his entire estate and making specific bequests, the purported Will both contains a level of formality and expresses sufficient testamentary intent. As the motion judge noted, in its form, the document "is clearly a professionally prepared Will and complete in every respect except for a date and its execution." Moreover, as the only living relative with whom decedent had any meaningful relationship, Jonathan, who is to receive the bulk of his uncle's estate under the purported Will, was the natural object of decedent's bounty.

The remaining question then is whether, under the undisputed facts of record, decedent gave his final assent to the document. Clearly, decedent's handwritten notation on its cover page evidencing that the original was sent to the executor and trustee named in that very document demonstrates an intent that the document serve as its title indicates—the "Last Will and Testament" of Richard Ehrlich. In fact, the very same day he sent the original of his Will to his executor, decedent executed a power of attorney and health care directive, both witnessed by the same individual. As the General Equity judge noted, "[e]ven if the original for some reason was not signed by him, through some oversight or negligence his dated notation that he mailed the original to his executor is clearly his written assent of his intention that the document was his Last Will and Testament."

Lest there be any doubt, in the years following the drafting of this document, and as late as 2008, decedent repeatedly orally

acknowledged and confirmed the dispositionary contents therein to those closest to him in life. The unrefuted proof is that decedent intended Jonathan to be the primary, if not exclusive, beneficiary of his estate, an objective the purported Will effectively accomplishes. Indeed, the evidence strongly suggests that this remained decedent's testamentary intent throughout the remainder of his life.

Moreover, decedent acknowledged the existence of the Will to others to whom he expressed an intention to change one or more of the testamentary dispositions therein. As the wife of decedent's closest friend recounted: "And [Richard] has to change [the Will] because there is another person that he gave, I don't know how you say it, annuities every month . . . in case he passed away, and he wants to take her off the [W]ill. And by that time Richard could barely write or sign, so I'm not surprised he didn't sign his [W]ill." Although there is no evidence whatsoever that decedent ever pursued this intention, the very fact that he admitted to such a document is compelling proof not only of its existence but of decedent's belief that it was valid and of his intention that it serve as his final testamentary disposition.

Given these circumstances, we are satisfied there is clear and convincing evidence that the unexecuted document challenged by appellants was reviewed and assented to by decedent and accurately reflects his final testamentary wishes. As such, it was properly admitted to probate as his Last Will and Testament.

The fact that the document is only a copy of the original sent to decedent's executor is not fatal to its admissibility to probate. Although not lightly excused, there is no requirement in Section 3 that the document sought to be admitted to probate be an original. Moreover, there is no evidence or challenge presented that the copy of the Will has in any way been altered or forged.

As with the case of admitting a copy of a Last Will to probate where the proof is clear, satisfactory, and convincing to rebut the presumption of the original's revocation or destruction, *In re Davis*, 127 *N.J.Eq.* 55, 57, 11 *A.2d* 233 (E. & A.1940); *In re*

*Bryan,* 125 *N.J.Eq.* 471, 473–74, 5 *A.*2d 774 (E. & A.1939); *In re Calef's Will,* 109 *N.J.Eq.* 181, 156 *A.* 475 (Prerog.Ct.1931), *affirmed, on opinion below,* 111 *N.J.Eq.* 355, 162 *A.* 579 (E. & A.1932), *cert. denied sub nom., Neely v. Stacy,* 288 *U.S.* 606, 53 *S.Ct.* 397, 77 *L.Ed.* 981 (1933), here, as noted, the evidence is compelling as to the testamentary sufficiency of the document, its preparation and reflection of decedent's intent. As has been stressed, a court's duty in probate matters is "to ascertain and give effect to the probable intent of the testator." *Fidelity Union Trust, supra,* 36 *N.J.* at 564, 178 *A.*2d 185 (internal citations and quotation marks omitted). In our view, the challenged document was properly admitted to probate because it meets all the intent-serving benefits of Section 2's formality and we discern no need to inflict the intent-defeating outcome requested by appellants and advocated by the dissent.

## II

That said, we also find the court properly exercised its discretion in not imposing sanctions under the Frivolous Litigation statute, *N.J.S.A.* 2A:15–59.1(a)(1). *See United Hearts, L.L.C. v. Zahabian,* 407 *N.J.Super.* 379, 390, 971 *A.*2d 434 (App.Div.) (recognizing abuse of discretion as standard for review of an award of sanctions), *certif. denied,* 200 *N.J.* 367, 982 *A.*2d 455 (2009). "An 'abuse of discretion is demonstrated if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error of judgment.'" *Ibid.* (quoting *Flagg v. Essex Cnty. Prosecutor,* 171 *N.J.* 561, 571, 796 *A.*2d 182 (2002)).

The Frivolous Litigation statute provides:

A party who prevails in a civil action, either as a plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.

[*N.J.S.A.* 2A:15–59.1(a)(1).]

■ To award costs to a prevailing party for a frivolous claim, the statute requires a showing that "the nonprevailing party either brought the claim in bad faith for harassment, delay, or malicious injury; or 'knew, or should have known that the complaint [or] counterclaim ... was without [any reasonable] basis in law or equity....'" *Buccinna v. Micheletti*, 311 *N.J.Super.* 557, 562–63, 710 *A.*2d 1019 (App.Div.1998) (quoting *N.J.S.A.* 2A:15–59.1(b)(2)).

■ *Rule* 1:4–8 also permits an attorney to be sanctioned for asserting frivolous claims on behalf of his or her client. *United Hearts, L.L.C., supra,* 407 *N.J.Super.* at 389, 971 *A.*2d 434. An assertion is deemed frivolous when "'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" *First Atl. Fed. Credit Union v. Perez,* 391 *N.J.Super.* 419, 432, 918 *A.*2d 666 (App.Div. 2007) (quoting *Fagas v. Scott,* 251 *N.J.Super.* 169, 190, 597 *A.*2d 571 (Law Div.1991)). Where a party has a reasonable and good faith belief in the claims being asserted, reallocation of attorneys' fees and expenses will not be awarded. *Ibid.* Moreover, "a pleading will not be considered frivolous for purposes of imposing sanctions under *Rule* 1:4–8 unless the pleading as a whole is frivolous." *United Hearts, L.L.C., supra,* 407 *N.J.Super.* at 394, 971 *A.*2d 434. Thus, when some allegations are later proved unfounded, a complaint is not rendered frivolous if it also contains non-frivolous claims. *Id.* at 390, 971 *A.*2d 434.

■ Here, there was no showing that appellants' objection to probate was filed "in bad faith, solely for the purpose of harassment, delay or malicious injury" or had no "reasonable basis in law or equity." *N.J.S.A.* 2A:15–59.1(b)(2). Indeed, appellants' challenge was soundly based as the disputed document did not satisfy the formalities of *N.J.S.A.* 3B:3–2. The document was not witnessed, notarized or dated, and was only a copy of a purported original. Consequently, to be admitted to probate, the document had to satisfy *N.J.S.A.* 3B:3–3, which placed a heavy burden of proof upon the document's proponent. Given the nature of that document's departure from Section 2's technical requirements, it

was neither unreasonable nor unfair for appellants to hold respondent to his rather exacting statutory burden. As properly noted by the motion judge, there was nothing in the record to suggest appellants' objection was filed to harass, delay or cause malicious injury. As there was a reasonable basis for appellants' claims in law and equity, the court properly denied respondent's motion for sanctions for frivolous litigation.

Affirmed.

SKILLMAN, J.A.D. (retired and temporarily assigned on recall), dissenting.

I do not believe that *N.J.S.A.* 3B:3-3 can be reasonably construed to authorize the admission to probate of an unexecuted will. Therefore, I dissent.

By its plain terms, *N.J.S.A.* 3B:3-3 only allows the admission to probate of a defectively executed will, not an unexecuted will. *N.J.S.A.* 3B:3-3 provides that if "a document ... was not executed in compliance with *N.J.S.A.* 3B:3-2," it may nonetheless be "treated as if it had been executed in compliance with *N.J.S.A.* 3B:3-2 if the proponent ... establishes by clear and convincing evidence that the decedent intended the document or writing to constitute [his or her] will." Thus, *N.J.S.A.* 3B:3-3 may be invoked only in a circumstance where the document "was not executed in compliance with *N.J.S.A.* 3B:3-2"; it does not apply if the document was not executed at all.

The conclusion that *N.J.S.A.* 3B:3-3 was only intended to authorize the admission to probate of a defectively executed will, and not an unexecuted will, is confirmed by its legislative history. *N.J.S.A.* 3B:3-3 was enacted in 2004 as one of a series of amendments to the New Jersey Probate Code. *L.* 2004, *c.* 132. The Senate Judiciary Committee's statement to the bill states that it was "modeled upon the 1990 version of the Uniform Probate Code." Senate Judiciary Committee, *Statement to Senate Bill No. 708,* enacted as *L.* 2004, *c.* 132 (reprinted after *N.J.S.A.* 3B:1-1).[1]

---

[1] This Committee statement was identical to the Sponsor's statement.

*N.J.S.A.* 3B:3–3 is virtually identical to section 2–503 of that Uniform Probate Code. Therefore, it is appropriate to consider the comments of the National Conference of Commissioners on Uniform State Laws to determine the circumstances under which *N.J.S.A.* 3B:3–3 may be relied upon to admit to probate a writing that has not been executed in conformity with *N.J.S.A.* 3B:3–2.

The Commissioners provided the following explanation of the purpose of adding section 2–503 to the Uniform Probate Code:

By way of dispensing power, this new section allows the probate Court to excuse a harmless error in complying with the formal requirements for executing or revoking a will. The measure accords with legislation in force in the Canadian province of Manitoba and in several Australian jurisdictions. The Uniform Laws Conference of Canada approved a comparable measure for the Canadian Uniform Wills Act in 1987.

Legislation of this sort was enacted in the state of South Australia in 1975.... A similar measure has been in effect in Israel since 1965....

Consistent with the general trend of the revisions of the UPC, Section 2–503 unifies the law of probate and nonprobate transfers, extending to will formalities the harmless error principle that has long been applied to defective compliance with the formal requirements for nonprobate transfers.

Evidence from South Australia suggests that the dispensing power will be applied mainly in two sorts of cases.... When the testator misunderstands the attestation requirements of Section 2–502(a) and neglects to obtain one or both witnesses, new Section 2–503 permits the proponents of the will to prove that the defective execution did not result from irresolution or from circumstances suggesting duress or trickery—in other words, that the defect was harmless to the purpose of the formality. The measure reduces the tension between holographic wills and the two-witness requirement for attested wills under Section 2–502(a). Ordinarily, the testator who attempts to make an attested will but blunders will still have achieved a level of formality that compares favorably with that permitted for holographic wills under the Code.

The other recurrent class of case in which the dispensing power has been invoked in South Australia entails alterations to a previously executed will. Sometimes the testator adds a clause, that is, the testator attempts to interpolate a defectively executed codicil. More frequently, the amendment has the character of a revision—the testator crosses out former text and inserts replacement terms. Lay persons do not always understand that the execution and revocation requirements of Section 2–502 call for fresh execution in order to modify a will; rather, lay persons often think that the original execution has continuing effect.

By placing the burden of proof upon the proponent of a defective instrument, and by requiring the proponent to discharge that burden by clear and convincing evidence (which Courts at the trial and appellate levels are urged to police with rigor), Section 2–503 imposes procedural standards appropriate to the seriousness

of the issue. Experience in Israel and South Australia strongly supports the view that a dispensing power like Section 2–503 will not breed litigation....

The larger the departure from Section 2–502 formality, the harder it will be to satisfy the Court that the instrument reflects the testator's intent. Whereas the South Australia and Israeli Courts lightly excuse breaches of the attestation requirements, they have never excused noncompliance with the requirement that a will be in writing, and they have been extremely reluctant to excuse noncompliance with the signature requirement. The main circumstance in which the South Australian Courts have excused signature errors has been in the recurrent class of cases in which two wills are prepared for simultaneous execution by two testators, typically husband and wife, and each mistakenly signs the will prepared for the other....

Section 2–503 means to retain the intent-serving benefits of Section 2–502 formality without inflicting intent-defeating outcomes in cases of harmless error. [Unif. Probate Code, cmt. on § 2–503 (citations omitted).]

In addition, the Commissioners' comments state that Section 2–503 "is supported by the *Restatement (Third) of Property: Wills and Other Donative Transfers* § 3.3 (1999)." That section provides:

A harmless error in executing a will may be excused if the proponent establishes by clear and convincing evidence that the decedent adopted the document as his or her will.

[*Restatement (Third) of Property* § 3.3 (1999).]

The comments to this section of the *Restatement* state:

... Only a harmless error in executing a document can be excused under this Restatement.

Among the defects in execution that can be excused, the lack of a signature is the hardest to excuse. An unsigned will raises a serious but not insuperable doubt about whether the testator adopted the documents as his or her will. A particularly attractive case for excusing the lack of the testator's signature is a crossed will case, in which, by mistake, a wife signs her husband's will and the husband signs his wife's will. Because attestation makes a more modest contribution to the purpose of the formalities, defects in compliance with attestation procedures are more easily excused.

[*Restatement (Third) of Property*, § 3.3 cmt. b (1999).]

Thus, both the comments to section 2–503 of the 1990 version of the Uniform Probate Code, from which *N.J.S.A.* 3B:3–3 was derived, and the comments to the *Third Restatement of Property*, which are cited with approval in the comments to the Uniform Probate Code, indicate that *N.J.S.A.* 3B:3–3 only authorizes probate of a defectively executed will, and not a document such as the

one the trial court admitted to probate, which does not contain either the signature of the decedent or any form of attestation.[2] This view of the intent of section 2–503 of the 1990 Uniform Probate Code is also reflected in *In re Will of Ranney*, 124 *N.J.* 1, 10, 589 *A.*2d 1339 (1991), decided before our Legislature's enactment of *N.J.S.A.* 3B:3–3, in which the Court described section 2–503 as adopting "the doctrine of substantial compliance."

The majority's decision relies heavily upon this court's interpretation of *N.J.S.A.* 3B:3–3 in *In re Will of Macool*, 416 *N.J.Super.* 298, 310, 3 *A.*3d 1258 (App.Div.2010), which concluded that for a will to be admitted to probate under this section, it must be established "by clear and convincing evidence, that: (1) the decedent actually reviewed the document in question; and (2) thereafter gave his or her final assent to it." Although I was on the panel that decided *Macool*, upon further reflection I have concluded that that opinion gives too expansive an interpretation to *N.J.S.A.* 3B:3–3; specifically, I disagree with the dictum that seems to indicate a draft will that has not been either signed by the decedent or attested to by any witnesses can be admitted to probate, provided the putative testator gave his or her "final assent" to the proposed will. *See id.* at 310–12, 3 *A.*3d 1258.

The comments to section 2–503 of the 1990 Uniform Probate Code and section 3.3 of the *Restatement (Third) of Property* both

---

[2] *In re Estate of Hall*, 310 *Mont.* 486, 51 *P.*3d 1134 (2002), cited in footnote three of the majority opinion, is an example of a case involving a defectively executed will that was admitted to probate under Montana's version of section 2–503 of the Uniform Probate Code. In that case, the decedent and his wife had their attorney draft a joint will. *Id.* at 1135. When the couple met in the attorney's office to discuss the draft, they made several handwritten changes. *Id.* at 1136. At the end of the meeting, the decedent asked whether the draft could stand as their will until the attorney sent them a final version. *Id.* at 1135. When the attorney said it could, the decedent and his wife both signed the draft will and the attorney notarized it. *Ibid.* Thus, the draft will was executed with all the required formalities except for the signatures of two attesting witnesses. The decedent died before he executed a typed version of the revised draft will. *Ibid.* Under these circumstances, the court concluded that the defectively executed draft joint will could be admitted to probate. *Id.* at 1136.

indicate that *N.J.S.A.* 3B:3–3 may be invoked only if there has been "harmless error" in the execution of a will, or what the Court in *Ranney* characterized as "substantial compliance" with the requirements for execution of a will. Under this view of *N.J.S.A.* 3B:3–3, a will could be admitted to probate if, as described in the comments to both the Code and *Restatement*, a husband and wife mistakenly signed each other's wills, or as described in illustration two in the comments to section 3.3 of the *Restatement*, a testator began signing his or her will but suddenly died before completing the signature. However, a mere verbal "assent" to the terms of a will that was not formalized by any signature on the document would not satisfy the prerequisites of *N.J.S.A.* 3B:3–3.

Moreover, even if it were appropriate to give *N.J.S.A.* 3B:3–3 a more expansive interpretation than is supported by the comments to the 1990 Uniform Probate Code and *Third Restatement of Property*, it still would not be appropriate to admit the unexecuted copy of the decedent's will to probate. The decedent was a trusts and estates attorney, who certainly would have known that a draft will had to be properly executed to become effective. Consequently, he could not have "intended the [unexecuted copy of the document] to constitute [his] will."

The majority states, quoting *Fidelity Union Trust Co. v. Robert*, 36 *N.J.* 561, 564, 178 *A.*2d 185 (1962), that "a court's duty in probate matters is 'to ascertain and give effect to the probable intent of the testator.'" *Ante* at 76, 47 *A.*3d at 19. However, "the doctrine of probable intent is available only to interpret, but not to validate, a will." *In re Will of Smith*, 108 *N.J.* 257, 265, 528 *A.*2d 918 (1987). "Probable intent comes into play only after a will is found to be valid." *Ibid.* Therefore, even if the probate of the decedent's unexecuted will would be more likely to effectuate his testamentary intent than intestacy, a draft will that was not executed in conformity with *N.J.S.A.* 3B:3–2 and does not satisfy the prerequisites of *N.J.S.A.* 3B:3–3 may not be admitted to probate.

Although *N.J.S.A.* 3B:3–3 does not authorize the admission to probate of the unexecuted copy of the decedent's purported will, there is a common law doctrine under which a copy of a lost will may be admitted to probate if the party seeking probate can present satisfactory evidence of the original will's contents and execution and that the will was not revoked before the testator's death. *See generally* 3 Bowe–Parker, *Page on Wills*, §§ 27.1 to .15; 29.156 to .166 (3rd ed.2004). The term "lost will" includes a will "which may be in existence but which cannot be found so as to be produced for probate." *Page on Wills, supra,* § 27.1, p. 433. There are New Jersey cases, mostly quite old, dealing with the attempts to admit copies of alleged lost original wills to probate in accordance with this common law doctrine. *See, e.g., In re Will of Davis,* 127 *N.J.Eq.* 55, 11 *A.*2d 233 (E. & A.1940); *In re Will of Bryan,* 125 *N.J.Eq.* 471, 5 *A.*2d 774 (E. & A.1939); *Campbell v. Smullen,* 96 *N.J.Eq.* 724, 725–29, 733–34, 125 *A.* 569 (E. & A.1924); *In re Will of Roman,* 80 *N.J.Super.* 481, 194 *A.*2d 40 (Co.1963); *In re Will of Calef,* 109 *N.J.Eq.* 181, 156 *A.* 475 (Prerog.1931), *aff'd o.b.,* 111 *N.J.Eq.* 355, 162 *A.* 579 (E. & A.1932), *cert. denied,* 288 *U.S.* 606, 53 *S.Ct.* 397, 77 *L.Ed.* 981 (1933); *Coddington v. Jenner,* 57 *N.J.Eq.* 528, 41 *A.* 874 (Ch.1898), *aff'd o.b.,* 60 *N.J.Eq.* 447, 45 *A.* 1090 (E. & A.1900).

Despite Jonathan Ehrlich's reliance upon *N.J.S.A.* 3B:3–3 in seeking to probate the unexecuted copy of the decedent's will found after his death, Jonathan does not appear to claim that the decedent actually intended that document to be his will, as required for probate under *N.J.S.A.* 3B:3–3. Instead, Jonathan's claim appears to be that the will found in the decedent's home was an unexecuted copy of an original executed will, which the decedent sent to his executor Van Sciver, and that the original was lost by Van Sciver or Van Sciver's estate after his death. For the reasons previously discussed, *N.J.S.A.* 3B:3–3 does not address such a claim.

In my view, Jonathan is entitled to prevail only if he can show, in conformity with the common law authority dealing with lost

wills, that the unexecuted will found in the decedent's home is a copy of an original executed will sent to Van Sciver, which was lost and not revoked by the decedent. However, because this case was presented solely under *N.J.S.A.* 3B:3–3, the trial court did not make any findings of fact regarding these issues. Indeed, the trial court concluded that the copy of the will found in the decedent's home could be admitted to probate under *N.J.S.A.* 3B:3–3 "[e]ven if the original ... was not signed by [the decedent]." Therefore, I would remand to the trial court to make such findings. I would not preclude the parties from moving to supplement the record to present additional evidence on the question whether the unexecuted copy of the will found in the decedent's home may be admitted to probate as a copy of the alleged executed original sent to Van Sciver.

For these reasons, I dissent from the part of the majority opinion affirming the judgment admitting the decedent's unexecuted will to probate. I concur with the part of the majority opinion affirming the denial of Jonathan's application for counsel fees under the Frivolous Litigation Statute.