**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3670-20

IN THE MATTER OF THE
ESTATE OF ALFRED
IAPALUCCI, SR., Deceased.

_____

Submitted September 13, 2022 – Decided October 5, 2022

Before Judges Messano and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Cape May County, Docket Nos. P-000100-20 and P-000101-20.

Frank DiDomenico, attorney for appellants/cross-respondents.

Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill, attorneys for respondent/cross-appellant (Elliott J. Almanza, of counsel and on the briefs).

PER CURIAM

Alfred G. Iapalucci, Sr. (Al), died on March 12, 2020, two weeks before his ninety-ninth birthday.[1]  In the 1970s, Al purchased approximately ten acres of land in Middle Township and over the ensuing years worked to build his business—a mobile home park—on the property.  Although Al retained title to the real estate in his own name, he formed a corporation, A&J Mobile Home Court, Inc. (A&J), to operate the business, and Al's eldest son, Alfred G. Iapalucci, Jr. (Fred), ran the mobile home park with Al.  Over the years, Al deeded small percentages of his ownership in the real property to Fred and his wife, Cindy.

In 2012, Fred accompanied his father to the law office of John Callinan, a retired judge and friend of Al and Fred.  Fred watched Al execute a will (the Will), power of attorney and advance medical directive in Callinan's office, witnessed by Callinan and his wife, who was Callinan's secretary.  Callinan gave Al the original Will and an unexecuted copy.  After Al's death, however, the Will could not be found.  Fred filed a caveat with the Cape May County Surrogate to prevent the filing of any "writing purporting to be [Al's] last will and testament."

---

[1] Because some family members share the same last name, we sometimes refer to them by their first names to avoid confusion and for ease of understanding. We intend no disrespect by this informality.

Al's daughter, Lynda Gazzara, joined by Al's three other children—Debra Tinsley, Lisa Iapalucci, and James Iapalucci, Sr. (collectively, the Siblings)—filed an order to show cause and verified complaint claiming they had no knowledge that their father had executed a will. The Siblings sought to discharge the caveat filed by Fred, have the Probate Court declare Al died intestate, and appoint Lynda administratrix of the estate.

Fred, however, obtained a copy of the executed Will from Callinan after Al's death; Fred filed his own verified complaint on the same day the Siblings filed theirs. Fred alleged the Siblings "found the original executed Will, w[ere] not pleased with its contents, and took it, along with the unexecuted copy." Among other things, the Will named Fred and Cindy executor and alternate executrix of Al's estate and bequeathed all real property Al owned, as well as his interests in A&J, to Fred; if Fred predeceased Al, the real property was bequeathed to Cindy. Fred's verified complaint asked the court to order production of the original Will, or, alternatively, to probate Fred's copy of the Will.[2]

Both sides moved for summary judgment. The judge initially accepted the Siblings' argument that because the Will had been in Al's possession and

---

[2] The two actions were heard together, although never formally consolidated.

now could not be found, a rebuttable presumption arose that Al revoked the will. See, e.g., In re Will of Davis, 127 N.J. Eq. 55, 57 (E. & A. 1940) ("If such a will was last seen in the custody of the testatrix or she had access to it[,] the fact that it cannot be found after her death raises the presumption that she destroyed it animo revocandi.").

The judge rejected Fred's argument that the motion record demonstrated as a matter of law the original Will had been stolen, and, pursuant to N.J.S.A. 3B:3-2 and -3, the executed copy of the Will should be admitted to probate.[3] The judge's April 1, 2021 order incorporated these findings and ordered a "factual hearing."

---

[3] N.J.S.A. 3B:3-2 sets forth the requirements for wills and holographic wills. N.J.S.A. 3B:3-3 provides:

> Although a document or writing added upon a document was not executed in compliance with N.J.S.[A.] 3B:3-2, the document or writing is treated as if it had been executed in compliance with N.J.S.[A.] 3B:3-2 if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute: (1) the decedent's will; (2) a partial or complete revocation of the will; (3) an addition to or an alteration of the will; or (4) a partial or complete revival of his formerly revoked will or of a formerly revoked portion of the will.

4

Fred moved for reconsideration. He argued that because the court recognized material disputed facts existed as to whether someone stole the Will, it was a mistake to conclude Al had exclusive possession of it, and, in turn, that the presumption of revocation applied. The judge agreed, and his May 5, 2021 order stated all issues would be resolved at trial.

The trial took place over two days, with the judge hearing from nine witnesses: Fred and his four siblings, Fred's daughter Andrea, Al's neighbor William Sturm, Al's accountant Harold Livingston, and Callinan. In a written decision following trial, the judge noted the court's "first task" was to determine whether Al maintained exclusive possession of the Will from its execution until its disappearance, and then "regardless of the findings regarding exclusive possession, . . . whether the . . . Will reflected Al's final testamentary intent." The judge exhaustively reviewed the evidence.

He noted none of the siblings disputed that the "Will was properly executed on August 3, 2012," and all of them, including Fred, acknowledged Al "had the requisite mental capacity that would be required to . . . revoke the Will . . . if that is what occurred." The judge found that all the siblings "organized a care schedule to look after their father as his health began to decline" during the last two years of his life, and the judge recounted their testimony regarding

A-3670-20

access to Al's locked closet, and a safe and locked metal box he kept in the closet.

The judge noted Lynda's testimony that during the last days of Al's life, she retrieved the power of attorney and advance medical directive, both executed at the same time as the Will, from Al's lockbox. The judge acknowledged "the indisputable conclusion that [there] were some nights w[h]ere the Siblings could have access[ed]" the places where the Will may have been stored. He concluded "Al did not retain exclusive possession of the . . . Will from the time it was executed until it went missing."

The judge then reviewed the evidence regarding Al's "testamentary intent," citing extensively from the testimony of Fred, Sturm, Livingston, and Callinan. He found that Fred was the "primary caretaker" of his father, and, together with Cindy, "looked after, cooked for, and spent all their time with Al." The judge further concluded, "Al and Fred were extremely close, and . . . Al's behavior and comments indicated that he planned to leave Fred with full ownership" of the business. The judge "was impressed with the credibility and consistency of Fred's testimony, as well as his witnesses," and "[w]hile [he] acknowledge[d] the good qualities of the Siblings . . . , overall, [the judge] was less impressed with their testimony and found it less credible." The judge

6

concluded all the evidence "support[s] the assertion that Al's testamentary intent remained unchanged until the end of his life." The judge ordered the Surrogate to admit the Will to probate, and this appeal followed.

Before us, the Siblings argue in three separate point headings variations on the same theme, specifically that the trial evidence did not support certain findings made by the judge, and, more generally, did not clearly and convincingly support the judge's conclusion that the Will reflected Al's final testamentary intent. Fred argues the judge properly found the presumption of revocation did not apply and, even if it did, the evidence clearly and convincingly overcame the presumption and demonstrated the Will reflected Al's "final testamentary intent." Fred also filed a defensive cross-appeal, contending that given the "one-sided" evidence in the motion record, the judge should have granted summary judgment in his favor without the need for a trial, and we should reverse the judge's April 1, 2021 order.

Our standard of review following a bench trial is well-known.

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"

[Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Tr. Created By Agreement Dated Dec, 20, 1961 by Johnson, 194 N.J. 276, 284 (2008)).]

In reviewing the judge's findings, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). However, we owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts. Manalapan Realty LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citing State v. Brown, 118 N.J. 595, 604 (1990)).

Having considered the arguments in light of the record and applicable legal standards, we affirm, albeit for slightly different reasons than expressed by the trial judge, see Hayes v. Delamotte, 231 N.J. 373, 387 (2018) ("A trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning." (citing Isko v. Plan. Bd. of Livingston, 51 N.J. 162, 175 (1968))). We dismiss the cross-appeal.

The Siblings first argue the judge's finding that Al stored the Will in the metal lockbox, along with the power of attorney and the advance medical directive, was not supported by substantial credible evidence in the record, and

they argue this erroneous finding was critical to the judge's conclusion that Al did not retain exclusive control over the Will after its execution and until his demise. However, there was ample evidence that Al <u>did</u> store the Will in the metal lockbox. More importantly, the only "critical" finding made by the judge was that regardless of the precise storage location for the Will—the safe or the metal lockbox—both were in Al's locked closet, and it was undisputed that several people, including some of the Siblings, regularly accessed the closet.

We part company with the judge and with the parties as to whether the presumption of revocation required a finding that Al had <u>exclusive</u> control of the Will. As already noted, our courts have said if a will was last seen in the possession of the decedent and cannot be found upon the decedent's death, there is a presumption the decedent destroyed the will with the intent to revoke it. <u>Davis</u>, 127 N.J. Eq. at 57. The trial evidence revealed that as far as anyone knew, the Will was last in Al's possession before his death.

None of the cases cited by Fred, nor any cases found in our research, require the decedent necessarily have "exclusive" possession of a lost will for the presumption of revocation to arise. <u>See, e.g.</u>, <u>ibid.</u> ("If such a will was last seen in the custody of the testatrix or she had access to it[,] the fact that it cannot be found after her death raises the presumption that she destroyed it animo

revocandi."); In re Will of Bryan, 125 N.J. Eq. 471, 473–74 (E. & A. 1939) ("The law . . . applicable to . . . lost wills is well defined. If such a will was last seen in the custody of the testatrix or she had access to it[,] the fact that it cannot be found after her death raises the presumption that she destroyed it animo revocandi." (emphasis added)); Campbell v. Smullen, 96 N.J. Eq. 724, 727 (E. & A. 1924) ("It is a well-established principle that when a will is left in the hands of the testator[] and is not found at the time of his death, a presumption of a revocation arises."); In re Will of Calef, 109 N.J. Eq. 181, 185 (N.J. Prerog. Ct. 1931) ("If the will is proved to have been in the testator's possession, and cannot afterwards be found, it will be presumed that he destroyed it, animo revocandi."), aff'd. o.b., 111 N.J. Eq. 355 (E. & A. 1932). None of these cases stand for the proposition that the presumption of revocation arises only if the testator has exclusive possession of a will without the possibility of access by others.

However, whether the presumption of revocation applied or not, we disagree with the Siblings' remaining two points. As best we can discern, the Siblings argue Fred failed to muster "clear and convincing" evidence to overcome any presumption of revocation and to support the judge's conclusion that the copy of the Will evidenced Al's final testamentary intent.

10                                                                                    A-3670-20

At common law, the presumption of revocation was rebuttable by evidence that was "clear, satisfactory and convincing and the burden [wa]s on the proponents." Bryan, 125 N.J. Eq. at 474. Historically, some courts said such evidence "must be sufficient to exclude every possibility of a destruction of the will by" the testator. Ibid. (citing In re Estate of Willett, 46 A. 519 (N.J. Prerog. Ct. 1900)). However, that onerous standard is inconsistent with more recent legislation aimed at implementing a decedent's testamentary intent and making it easier to avoid intestacy by probating a technically deficient will. See N.J.S.A. 3B:3-3 (requiring the proponent of a will not executed in compliance with N.J.S.A. 3B:3-2 to "establish[] by clear and convincing evidence that the decedent intended the document . . . to constitute" his will) (emphasis added).

The clear and convincing standard also applies to one seeking to probate a lost will. "The term 'lost will' includes a will 'which may be in existence but which cannot be found so as to be produced for probate.'" In re Estate of Ehrlich, 427 N.J. Super. 64, 83 (App. Div. 2012) (Skillman, J., dissenting) (quoting 3 Bowe-Parker, Page on Wills, §§ 27.1 at 433 (3d ed. 2004)). "[W]e require the proponent of a lost or missing will to establish the supposed intent of the document by clear and convincing evidence." Pivnick v. Beck, 326 N.J. Super.

11

474, 483–84 (App. Div. 1999) (citing In re Will of Roman, 80 N.J. Super. 481, 483 (Hudson Cnty. Ct. 1963), aff'd o.b., 165 N.J. 670 (2000)).

In Ehrlich, we construed N.J.S.A. 3B:3-3 to permit the probate of an unexecuted copy of will when the original could not be found. 427 N.J. Super. at 75. We held: "The fact that the document is only a copy of the original sent to decedent's executor is not fatal to its admissibility to probate. Although not lightly excused, there is no requirement in N.J.S.A. 3B:3-3 that the document sought to be admitted to probate be an original." Ibid. We noted, "in dispensing with technical conformity, N.J.S.A. 3B:3-3 imposes evidential standards and safeguards appropriate to satisfy the fundamental mandate that the disputed instrument correctly expresses the testator's intent." Id. at 74. In "the case of admitting a copy of a [l]ast [w]ill to probate" the proof must be "clear, satisfactory, and convincing to rebut the presumption of the original's revocation or destruction." Id. at 75 (citing Davis, 127 N.J. Eq. at 57).

In short, whether applying common law principles dealing with overcoming the presumption of revocation or applying N.J.S.A. 3B:3-3 liberally for its intended remedial purposes to probate a technically deficient will, see id. at 72, the proponent of an executed copy of a will may successfully probate that

copy by demonstrating "the instrument reflect[s] the testator's final testamentary intent" by clear and convincing evidence.  Id. at 73.

Here, the judge found that regardless of whether the presumption of revocation applied, Fred established by clear and convincing evidence that the executed copy of the Will reflected Al's final testamentary intent.  There was substantial support for this conclusion, with little, if any, evidence to the contrary.  Certainly, given our standard of review, we accept the judge's findings and conclusions on this critical point.

Affirmed.  The cross-appeal is dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3670-20