**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4693-14T4
             A-4746-14T4

IN THE MATTER OF THE
TRUST OF DR. MERRITT
EVAN LONDON, M.D.,
DECEASED.

_____

Argued June 8, 2017 — Decided September 6, 2017

Before Judges Hoffman, O'Connor and Whipple.

On appeal from Superior Court of New Jersey,
Chancery Division, Monmouth County, Docket No.
P-283-13/S#236312.

Kenneth L. Moskowitz argued the cause for
appellants Mark London and Patricia London
Thieffry in A-4693-14 (Brown Moskowitz &
Kallen, PC, attorneys; Mr. Moskowitz and
Steven R. Rowland, of counsel and on the
briefs).

Derek M. Cassidy argued the cause for
appellant Thomas Arnold in A-4746-14 (The
Cassidy Law Firm, attorneys; Mr. Cassidy and
Harold J. Cassidy, on the briefs).

James M. Nardelli argued the cause for
respondents The Salvation Army, NYU Langone
Medical Center, Simon Wiesenthal Center,
Jewish Family and Children's Service of
Greater Monmouth County, and B'nai B'rith
Foundation of the United States (Parsons &
Nardelli, attorneys; Mr. Nardelli, on the
briefs).

Marc Krefetz, Deputy Attorney General, argued the cause for respondent Attorney General of New Jersey, in the position of parens patriae (Christopher S. Porrino, Attorney General, attorney, joins in the brief of respondents).

PER CURIAM

This consolidated appeal concerns the distribution of the estate of Dr. Evan Merritt London (decedent). The appellants are plaintiffs Patricia London Thieffrey (Patti) and Mark London (Mark), decedent's niece and nephew, and Thomas Arnold (Thomas), decedent's long-time friend. These parties appeal from separate summary judgment orders of the Chancery Division, Probate Part, dismissing plaintiffs' verified complaint and Thomas's counterclaim. Having thoroughly reviewed the record and applicable law, we affirm.

We begin by reciting the relevant procedural history. On August 29, 2013, plaintiffs filed a two-count verified complaint, seeking in count one a judgment declaring that an unsigned trust prepared in May 2013 "is valid and enforceable," and "supersedes" a trust decedent signed in 2012. In count two, plaintiffs sought a declaration that Thomas was entitled to one of decedent's two IRA accounts, and that they were entitled to the second.

The New Jersey Attorney General filed an answer and affirmative defenses to plaintiffs' complaint, on behalf of various charitable organizations that would be impacted by the

unsigned 2013 trust. Shortly thereafter, respondents NYU Langone Medical Center (NYU Langone), Simon Wiesenthal Center, the Salvation Army, B'nai B'rith Foundation of the United States (B'nai B'rith), and Jewish Family and Children's Service of Greater Monmouth County (Jewish Service) (collectively, charitable organizations), filed an answer and affirmative defenses. Respondent Wells Fargo Bank, N.A. (Wells Fargo Bank), as trustee of decedent's 2012 trust, also filed an answer and affirmative defenses. Thomas filed an answer, counterclaim, and cross-claim, seeking a declaration that he was entitled to three of decedent's private bank accounts, including one of decedent's IRAs.

On June 20, 2014, Wells Fargo Advisors, LLC (WFA), the custodian of decedent's IRA accounts, filed an intervenor answer, affirmative defenses, and a complaint for interpleader, requesting the court determine the beneficiaries of the IRA accounts. In July 2014, the charitable organizations and Wells Fargo Bank filed a joint motion for partial summary judgment on count one of plaintiffs' complaint. Plaintiffs then filed a cross-motion for summary judgment on count one. On October 31, 2014, the court granted respondents' motion and entered an order dismissing count one of plaintiffs' complaint.

Following additional discovery, the charitable organizations again moved for summary judgment, seeking to dismiss count two of

plaintiff's complaint and the counterclaim filed by Thomas. WFA also moved for summary judgment on its interpleader complaint, and plaintiffs filed a cross-motion for summary judgment. On May 12, 2015, after oral argument, the court granted respondents' motion and entered an order dismissing count two of plaintiffs' complaint and Thomas's counterclaim.

This appeal followed. Given the nature of the record, we first address the issues pertaining to count one, and then we separately address the issues concerning count two.

I.

We discern the following facts relating to count one, viewed in the light most favorable to appellants, the non-moving parties. Ramos v. Flowers, 429 N.J. Super. 13, 16 (App. Div. 2012).

Decedent enjoyed a long career as a medical doctor, specializing in ophthalmology. He married twice but produced no children from either marriage. However, decedent maintained a friendship with Thomas for over forty years, and Thomas certified he was decedent's close companion. Toward the end of decedent's life, Thomas saw him on a daily basis, serving as his "driver, deliveryman, confidante, business associate, [and] adviser."

Plaintiffs are the children of decedent's once-estranged brother, and were decedent's next closest relatives. According

to their complaint, decedent referred to plaintiffs as "his only family."

In the summer of 2012, decedent became ill from complications of prostate cancer and a colostomy, resulting in a lengthy stay at Riverview Hospital (Riverview) from June 16, 2012 through August 24, 2012. Following this stay, at the urging of plaintiffs and Thomas, decedent agreed to move into the Brandywine assisted living facility (Brandywine). Decedent passed away on May 24, 2013, after being rushed from Brandywine to the Riverview emergency room.

Decedent executed several wills and trusts over his lifetime, the first on July 14, 1998 (1998 Will). The 1998 Will devised a large portion of decedent's estate to plaintiffs.

Over ten years later, in the spring of 2010, decedent hired attorney Stephen J. Oppenheim to handle his estate planning matters. Oppenheim testified at deposition that he recommended decedent "use a revocable trust as the primary vehicle to dispose of his [e]state[,] with a beneficiary designation for his IRA[,]" in addition to creating a "pour-over" will.[1] He noted that in 2010, decedent's estate was valued at approximately six million dollars.

---

[1] Oppenheim explained that a "pour-over" will adds an estate "to the trust fund to be administered and distributed as the trust agreement provided."

On July 9, 2010, decedent executed a trust document, titled "Trust Agreement[,] The Merritt E. London Trust" (July 2010 trust). This trust provided for a one-time $100,000 bequest to each plaintiff, and created trusts for each plaintiff, with each trust funded by 40 percent of the residual estate. It further provided for a $25,000 bequest to decedent's housekeeper, and $10,000 bequests to Thomas and sixteen other friends and relatives; the trust further provided for bequests to three listed charities, and bequeathed 10 percent of the residual estate to six charitable organizations.

Two years later, during his hospitalization at Riverview in the summer of 2012, decedent executed several revised trust documents, each time altering the amounts devised to plaintiffs and certain charitable organizations. First, on June 22, 2012, decedent executed a will, beneficiary designation, and trust (June 2012 Trust), which lowered the one-time bequests to plaintiffs to $50,000 each. It further lowered the percentage of their residual estate trusts to 25 percent each and divided 40 percent among six named charitable organizations. It also granted Thomas a $75,000 specific bequest.

Shortly thereafter, on July 7, 2012, decedent executed a new trust agreement (July 2012 Trust), will, beneficiary designation, and power of attorney. In relevant part, the July 2012 Trust

eliminated the one-time specific bequests to plaintiffs and reduced the amount they would receive in trust to $600,000 each; it also granted decedent's housekeeper a $500,000 trust. The remainder was to be placed in trust for named charitable organizations. Thomas retained his $75,000 bequest.

Next, on August 17, 2012, Oppenheim met with decedent at Riverview, where he executed a new will, trust agreement, and beneficiary designation. The trust, dated August 21, 2012 (August 2012 Trust), increased the amount for plaintiffs to $1,000,000 each, in trust, and retained the housekeeper's trust. It devised the remainder as 19 percent each to the Riverview Medical Center Foundation, NYU Langone, the Simon Wiesenthal Center, the Salvation Army, and Jewish Service, and 5 percent to B'nai B'rith. It further maintained a $75,000 specific bequest for Thomas.

On October 4, 2012, decedent executed a document revising the August 2012 trust, titled "The Merritt E. London Trust[,] First Amendment of Trust Agreement." (October 2012 Amendment). The October 2012 Amendment removed Riverview as a beneficiary of the residual estate, instead dividing 95 percent equally to the remaining organizations and continuing 5 percent to B'nai B'rith.

Several months later, on April 5, 2013, Oppenheim wrote to decedent and enclosed copies of several pages of the July 2012 Trust. Oppenheim noted that these pages listed "the names of

[decedent's] beneficiaries, the amounts provided for each of them, and for [decedent's] [t]rusts for the benefit of [his housekeeper], Patti, and Mark, and the [o]rganizations' shares of any distribution provided for them."  At deposition, Oppenheim could not recall why he sent these documents to decedent, but noted it must have stemmed from "a conversation with somebody."

Decedent's Wells Fargo financial advisor, Anthony Frigoletto, testified at deposition that approximately one month later, on May 11, 2013, he met with decedent at Brandywine to discuss changes to his estate plan, which he marked on a copy of the July 2012 Trust.  These changes involved granting decedent's brother a $100,000 bequest, granting Riverview 28 percent of the residuary reserved for the organizations, and decreasing NYU Langone's share to 10 percent.  Frigoletto faxed Oppenheim a copy of the marked document on May 13, 2013, informing him decedent "still wants changes."

Oppenheim then met with decedent at Brandywine on May 15, 2013.  According to Oppenheim's memorandum of that date, he and decedent discussed changes to his trust agreement, which included giving "specific amounts to the beneficiary organizations" and "divid[ing] the balance of the trust fund between Patti and Mark." Oppenheim made notations of these changes on an unexecuted copy

of the August 2012 Trust.  At deposition, he described the meeting as follows:

> I sat down with [decedent], and I had a copy of the last trust agreement with me.  I knew what he wanted.  Generally[,] he wanted to talk to me about changes.  And we went over that trust agreement paragraph by paragraph. And he told me about the changes that he wanted to make.  And I made little notes on my copy of the trust agreement.

Oppenheim affirmed he was "absolutely certain" that his notations were the changes decedent described at their May 15 meeting.  He thus prepared a new trust agreement (May 2013 Trust), granting eleven specific bequests to eleven friends and relatives, including $50,000 for Thomas and $100,000 for decedent's brother. The trust further devised the residual estate to Patti and Mark in equal shares, replacing the charities previously designated, minus the $500,000 trust fund still allocated to his housekeeper. The revised plan further granted specific bequests to the following charities: $10,000 to the United Way of Monmouth County, $10,000 to the Foodbank of Monmouth and Ocean Counties, $70,000 to Riverview, $40,000 to NYU Langone, $40,000 to the Simon Wiesenthal Center, $40,000 to the Salvation Army, $40,000 to Jewish Service, and $25,000 to B'nai B'rith.

Oppenheim testified he hand-delivered an unsigned copy of the May 2013 Trust to Brandywine at 8:00 a.m. on May 22, 2013, leaving it with a member of the staff for delivery to decedent.  Although

9

he could not remember the exact date, Oppenheim recalled a subsequent phone conversation where decedent said he received the document and "was going to look at it"; however, Oppenheim added he did not believe decedent did so.

Oppenheim further stated he did not know whether decedent was going to sign the May 2013 Trust, because he "expected [decedent] to review it and to let [him] know whether he approved of it. And if he did, then [they would] have a signing ceremony." When asked if the document he dropped off "could have been executed[,]" Oppenheim answered, "Not really. It could have been executed if the execution was accompanied by witnesses and by a Notary and if we had done it in the formal way." He added, "If [decedent] approved it, we would not have had to make any change. I might have prepared another document . . . or I might not have. But that certainly could have been used, yes."

Oppenheim also attached a cover sheet to the May 2013 Trust, which he testified summarized the major changes "in a very abbreviated form." The cover sheet stated that if decedent found the May 2013 Trust satisfactory, Oppenheim would prepare a will, new beneficiary designation, and power of attorney, and help decedent execute the documents. Oppenheim asked decedent to call him "after you complete your review of the new Trust Agreement."

Frigoletto testified decedent called him after he received the new document, requesting he "come down there and see him because he wanted me to read something with him, the new draft, and he wanted my opinion with what was written." Frigoletto then called Oppehnheim to obtain a copy of the trust. Frigoletto received an email from Oppenheim, dated May 22, 2013, containing a copy of the May 2013 Trust and advising that decedent "decided recently that his niece and nephew should receive the biggest part of his estate, free of trust, instead of the organizations named by his current Trust Agreement." After receiving this email, Frigoletto again spoke to decedent, who asked Frigoletto "what [he] thought" and "pleaded with [Frigoletto] to come down" to meet with him.

When asked whether he believed decedent had reviewed the May 2013 trust, Frigoletto stated, "Oh, I know he hadn't reviewed it. I know he hadn't read it because he said he was waiting to see me. He certainly knew what was in it because he knew what I was talking about in our conversation, and he seemed apprehensive, but that's just an opinion." Later in the deposition, Frigoletto stated he was unsure whether decedent reviewed the document at the time of the second phone call, but he knew decedent did not have it in front of him when they spoke. Frigoletto then described the conversation that followed:

11                                                              A-4693-14T4

Q. And did you read the document to him line-by-line?

A. No.

Q. Did you read any specific provisions to him?

A. Yes.

Q. Which ones did you read to him?

A. The main — the addition of his brother, the changes of some of the moving parts, and that's about it, and then it concluded with that I was — based on every single conversation that I've ever had with him that I was surprised about the size and how big this change was, but that being said, "It's your money. You can give it away however you like, obviously. You don't need me to come down there and review it with you if this is what you want to do."

And then, again, he asked me if I would come down and he wanted me there fast.

. . . .

Q. And did he indicate to you that he intended to sign the document as written?

A. No, he never indicated that.

Q. And at the end of the call did he still express a desire to review the document with you?

A. Yes.

Q. And did you make plans to go and review the document with him?

A. Sure, but at that point I was concerned about the fact that I thought he knew what was in the document and I didn't really know why

12

he needed me to endorse it, and I told him again "you don't need me to drive down there for you to do what you want to do." You know, "If you want, just do what you need to do, sign it and send it in."

Q. But he still expressed the desire to speak with you?

. . . .

A. Yes.

Q. And to review the document with you?
. Yes.

Mark certified that on the afternoon of May 22, decedent told him, "I am signing a new [w]ill, and I am providing for your father for the first time." Thomas similarly certified that "[a] few days before his death[, decedent] told me his will was dropped off and it reflects his 'wishes' or 'desires.'"

On May 23, 2013, decedent complained of severe pain, prompting Thomas and Felipe Alicos, decedent's caretaker, to drive decedent to the emergency room in Thomas's car. Both men certified that on the way to the emergency room, decedent asked to return to Brandywine so he could sign his "will"; however, Thomas refused to turn around because he felt decedent needed urgent care. Alicos further certified that after arriving in the emergency room, decedent continued to insist on signing his will.

Thomas eventually traveled to Brandywine and located a manila envelope on decedent's desk, as decedent had instructed. However,

13                                                    A-4693-14T4

he was unable to see decedent until 4:00 p.m. the next day, May 24, 2013; by that point, decedent was not in a condition to sign the documents. Decedent passed away without signing at 11:30 p.m. that night.

On May 25, 2013, Oppenheim met with Mark and Thomas at Brandywine. He testified that the envelope containing the May 2013 Trust was "sealed in just the same way that [he had] sealed it," but he also admitted his secretary could have closed the envelope. Oppenheim opened the envelope, verifying decedent had not signed the document. Oppenheim said he had hoped to find decedent's signature, but acknowledged he was "expecting it had not been signed."

Following oral argument on count one, the motion judge rendered a decision from the bench, granting summary judgment for respondents. Applying our holding in In re Probate of Will and Codicil of Macool, 416 N.J. Super. 298 (App. Div. 2010), the judge concluded:

> . . . [I]t is clear to the [c]ourt that the Macool test has not been met by the petitioners in this case. I find that pursuant to Macool . . . , we hold for a writing to be admitted into probate as a [w]ill under [N.J.S.A.] 3B:3-3 the proponent of the writing intended to constitute such a [w]ill must prove, and we're talking about a trust here, by clear and convincing evidence that 1) the decedent actually reviewed the document in question, and 2) thereafter gave his or her final assent to it. Absent either

14

one of these elements a trier of fact can only speculate as to whether the proposed writing accurately reflects the decedent's final testamentary wishes.

And in this case it is clear to the [c]ourt that the plaintiffs have not shown by clear and convincing evidence that the decedent actually reviewed the document in question. Mr. Oppenheim testified that the envelope was in the exact same condition that he had delivered it to Dr. London. Although there is some testimony by Mr. Frigoletto that he went over this testimony, reviewed this testimony with Dr. London I find that that is not sufficient, and that the testimony really is that he never reviewed it with Dr. London.

. . . [I]n Macool . . . [the testator] never had the opportunity to confer with counsel after reviewing the document to clear up any ambiguity, modify any provision or express her final assent to this rough draft.

And that's exactly what happened here. I find that the decedent never actually reviewed the document in question and he never, ever gave his final assent to it. Neither elements have been proven by the plaintiffs by clear and convincing evidence.

I also find that it's not clear that Dr. London actually reviewed it. He talked it over with Mr. Frigoletto and they talked about various parts of it, but . . . I find that that review was not sufficient in this case.

And also, I find that, so the first prong is not met, and the second prong, giving his final assent to it, that wasn't met either because the circumstances show that he never gave his final assent to that [w]ill, to that alleged [w]ill.

So I find that [N.J.S.A.] 3B:3-3 has not been complied with, that the test set forth

15

> in Macool has not been complied with by
> plaintiffs. There are no issues of material
> fact at this point and I will grant partial
> summary judgment to . . . the respondents in
> this case. The writing that purports to be
> the trust of Merritt London will not be
> admitted.

We review a grant of summary judgment under the same standard as the motion judge and accord "no special deference" to the judge's legal determinations. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). We must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Ibid. (quoting R. 4:46-2(c)). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)).

Ordinarily, a will[2] must comply with the following requirements of N.J.S.A. 3B:3-2:

---

[2]  If an instrument is clearly testamentary in nature, its validity depends upon whether the proofs demonstrate that it was executed

a. Except as provided in subsection b. and in [N.J.S.A.] 3B:3-3, a will shall be:

(1) in writing;

(2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and at the testator's direction; and

(3) signed by at least two individuals, each of whom signed within a reasonable time after each witnessed either the signing of the will as described in paragraph (2) or the testator's acknowledgment of that signature or acknowledgment of the will.

b. A will that does not comply with subsection a. is valid as a writing intended as a will, whether or not witnessed, if the signature and material portions of the document are in the testator's handwriting.

c. Intent that the document constitutes the testator's will can be established by extrinsic evidence, including for writings intended as wills, portions of the document that are not in the testator's handwriting.

Plaintiffs acknowledged that decedent did not sign or hand-write the May 2013 Trust. Rather, they argued the facts supported

---

in accordance with the formal requirements of the statute of wills, N.J.S.A. 3B:3-1 to -49, and with the requisite testamentary intent. See In re Catanio, 306 N.J. Super. 439, 445 (App. Div. 1997) (holding a document labelled a trust to comprise instead a codicil, because the document "by its own terms provides that it will become effective upon the settlor's death," while also noting that the document had been executed in compliance with the statute of wills).

admitting the trust to probate under N.J.S.A. 3B:3-3, which provides:

> Although a document or writing added upon a document was not executed in compliance with [N.J.S.A.] 3B:3-2, the document or writing is treated as if it had been executed in compliance with [N.J.S.A.] 3B:3-2 if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute: (1) the decedent's will; (2) a partial or complete revocation of the will; (3) an addition to or an alteration of the will; or (4) a partial or complete revival of his formerly revoked will or of a formerly revoked portion of the will.
>
> [N.J.S.A. 3B:3-3.]

As noted, the motion judge rejected this argument, finding plaintiffs failed to provide evidence that decedent reviewed and assented to the document prior to his death, as required by Macool, supra, 416 N.J. Super. 298. Now on appeal, plaintiffs and Thomas argue the judge erred because she disregarded the summary judgment standard and made factual conclusions that fell within the purview of "the trier of fact after a full evidentiary trial," and she ignored material facts favoring their position. They further assert the judge erred by failing to distinguish Macool, contending the record contains material evidence showing decedent did review and assent to the May 2013 Trust.

In Macool, we held the facts at issue supported the trial court's refusal to admit an unsigned will to probate. Similar to

18

A-4693-14T4

the instant matter, the testator in <u>Macool</u> met with her attorney prior to her death to discuss changes to her will. At the meeting, she gave the attorney a list of handwritten notations, two of which were unclear as to her intent. <u>Id.</u> at 304, 309. The attorney "dictated the entire will while [the testator] was there," and then had his secretary type a rough draft version. <u>Id.</u> at 304-05. The attorney expected the testator to return to review the draft; however, she passed away approximately one hour after leaving his office. <u>Id.</u> at 305.

Construing <u>N.J.S.A.</u> 3B:3-3, we established the following two-prong test for admitting a writing to probate under this provision:

> [F]or a writing to be admitted into probate as a will under <u>N.J.S.A.</u> 3B:3-3, the proponent of the writing intended to constitute such a will must prove, by clear and convincing evidence, that: (1) the decedent actually reviewed the document in question; and (2) thereafter gave his or her final assent to it. Absent either one of these two elements, a trier of fact can only speculate as to whether the proposed writing accurately reflects the decedent's final testamentary wishes.
>
> [<u>Macool</u>, <u>supra</u>, 416 <u>N.J. Super.</u> at 310.]

We affirmed, in relevant part in <u>Macool</u>, concluding the testator failed to meet both prongs of the test. <u>Ibid.</u> Significantly, we observed that the testator "never had the opportunity to confer with counsel after reviewing the document to clear up any ambiguity, modify any provision, or express her

19

final assent to this 'rough' draft." Id. at 309. We labeled the will a "work in progress" because the attorney purposely omitted two named beneficiaries, and we found the lack of clarity in the testator's notes "render[ed] their inclusion in the draft will problematic." Ibid. However, we determined that "a writing offered under N.J.S.A. 3B:3-3 need not be signed by the testator in order to be admitted to probate." Id. at 311. We further noted, "[h]ad [the testator] been able to read the draft will . . . and thereafter express her assent to its content in the presence of witnesses or by any other reasonably reliable means," the result would have been different. Id. at 312.

We confirmed the Macool holding in In re Estate of Ehrlich, 427 N.J. Super. 64, 71-72 (App. Div. 2012), certif. denied, 213 N.J. 46 (2013). Recognizing that the provisions of N.J.S.A. 3B:3-3 are remedial in nature and entitled to a liberal interpretation, we nevertheless observed that "the greater the departure from [N.J.S.A. 3B:3-2]'s formal requirement, the more difficult it will be to satisfy [N.J.S.A. 3B:3-3]'s mandate that the instrument reflect the testator's final testamentary intent." Ehrlich, supra, 427 N.J. Super. at 72-73. We emphasized that N.J.S.A. 3B:3-3

> places on the proponent of the defective
> instrument the burden of proving by clear and
> convincing evidence that the document was in
> fact reviewed by the testator, expresses his

20                                                    A-4693-14T4

> or her testamentary intent, and was thereafter assented to by the testator. In other words, in dispensing with technical conformity, [N.J.S.A. 3B:3-3] imposes evidential standards and safeguards appropriate to satisfy the fundamental mandate that the disputed instrument correctly expresses the testator's intent.
>
> [Id. at 74.]

However, in Ehrlich we affirmed the trial court's admission of an unsigned will to probate, which had been discovered in a drawer in the testator's home. Id. at 68. We found that the testator, a trusts and estates attorney, had clearly prepared and reviewed the will himself. Id. at 67, 74. We further determined he gave final assent to the will, because he made a handwritten notation stating he sent the original to the executor and trustee of his estate, and "in the years following the drafting of this document . . . repeatedly orally acknowledged and confirmed the dispositionary contents therein to those closest to him in life." Id. at 74-75.

Having considered both Macool and Ehrlich, we agree with the motion judge that even giving plaintiffs the benefit of all favorable inferences, the record lacks evidence to support admission of the May 2013 Trust to probate under N.J.S.A. 3B:3-3. Nor do we discern any basis to conclude that an evidentiary trial would yield any additional relevant evidence to satisfy the requirement of proof, by clear and convincing evidence, that

21

decedent reviewed and assented to the document. Notably, the record contains no evidence from which a trier of fact could conclude that decedent "confer[red] with counsel after reviewing the document to clear up any ambiguity, modify any provision, or express [his] final assent." Macool, supra, 416 N.J. Super. at 309.

Indeed, Oppenheim only testified he had an initial "s[it] down" with decedent to go over his changes "paragraph by paragraph," making handwritten notes on a copy of the August 2012 Trust. This clearly did not constitute review or assent, as the testator in Macool also discussed changes with her attorney in a similar manner. Id. at 304-05. Oppenheim clearly expected decedent to contact him again to express his final approval, which never occurred. Additionally, although we agree with appellants that decedent did not have to "read" the document himself, Oppenheim's testimony regarding the envelope strongly supports the conclusion decedent did not review its contents.

Furthermore, although Frigoletto testified he went over "specific provisions" with decedent, his testimony clearly shows that decedent desired to wait to review the document with him in person. As in Macool, decedent's knowledge of the contents does not establish review. Moreover, decedent's repeated requests to

22

meet with Frigoletto strongly suggest uncertainty as to the finality of the proposed changes.

We are therefore satisfied the record reflects no genuine issue as to whether decedent reviewed and assented to the May 2013 Trust prior to his death. Since plaintiffs cannot show decedent reviewed the draft, any further inquiry beyond summary judgment would be to engage in "speculat[ion] as to whether the proposed writing accurately reflects the decedent's final testamentary wishes." Id. at 310. Decedent's emergency requests that Thomas retrieve his "will" for signing do not show he reviewed the May 2013 Trust or assented to its contents. Consequently, we affirm the order dismissing count one of plaintiffs' complaint.

## II.

We now address the grant of summary judgment on count two, again reviewing the facts in the light most favorable to plaintiffs and Thomas. Ramos, supra, 429 N.J. Super. at 16. We discern the following facts from the record.

According to WFA's interpleader complaint, decedent opened two IRAs with First Union Bank in 1997, under account numbers xxxx-9415 and xxxx-3249. Wells Fargo later acquired First Union, including decedent's accounts. At the time of his death, WFA possessed two IRAs belonging to decedent, account xxxx-3249, valued at $880,500, and xxxx-7439, valued at $787,086.32.

23

WFA also possessed "undated IRA Account and Simplified Employee Beneficiary Designations for [d]ecedent's IRA accounts." These forms designated Patti and Mark as beneficiaries of two First Union accounts: Simplified Employee Pension Plan (SEP) xxxx-5059, and IRA xxxx-5019.

WFA further noted it "received an incomplete IRA beneficiary form in October 2012 that did not have any account numbers on it and stated 'see attached.'" The attachment listed certain charitable organizations as the beneficiaries. This is a reference to the "Beneficiary Designation" form decedent executed on October 4, 2012, in connection with the October 2012 Amendment. The form states, "All benefits that become payable from my Wells Fargo individual retirement account in the event of my decease shall be paid as this Beneficiary Designation provides." It then devises various portions to the named charitable organizations.

The record shows that in January 2013, decedent advised Frigoletto that he wanted to open a joint checking account, payable on death (POD) to Thomas. On January 14, 2013, Wells Fargo employee Zelmira Cappola opened a "PMA Premier Checking" account for decedent, account number xxxx-4068, POD Thomas. On January 15, $200,000 was transferred into that account. Next, on January 23, 2013, decedent designated a traditional brokerage account, number xxxx-8954, as transfer on death (TOD) Thomas. On January

24

28, the $200,000 sum from xxxx-4068 was transferred into this new brokerage account.

According to the Wells Fargo system, Cappola entered a note in "London Household Notes from Client Link," dated January 14, 2013, which appears to indicate she intended to link the new checking account xxxx-4068 to brokerage account xxxx-8954. However, for reasons that are unclear, the checking account was linked to decedent's IRA, xxxx-3249, as part of a Wells Fargo "Private Banking PMA Package."  In addition to accounts xxxx-4068 and xxxx-3249, decedent's PMA Package contained a third account, xxxx-5162, labeled "Retirement Savings."

The summary pages on decedent's PMA Package statements from January through April 2013 are labeled "MERRIT EVAN LONDON MD[;] POD THOMAS ARNOLD."  Each statement lists the total combined assets of the three accounts; the April 30, 2013 statement shows $834,776.36 in total assets: $834,739.26 from the IRA account, xxxx-3249, $29.98 from the "Retirement Savings" account, xxxx-5162, and $7.12 from "PMA Premier Checking Account," xxxx-4068. However, on the individual pages for each account, only the PMA Premier Checking Account, xxxx-4068, is listed POD Thomas.

At deposition, Cappola stated the linked accounts were related "[j]ust for statement purpose[s] . . . .  They each have their own title, so they belong to [decedent], but they're three

A-4693-14T4

different accounts." She noted that when customers open a PMA checking account, they can link other accounts of their choosing, or they can let Wells Fargo automatically attach all available accounts that are not otherwise linked, in order to meet the $25,000 minimum balance for the PMA checking account. She did not remember if decedent chose to link the accounts at issue but conceded it was possible he intended to do so.

Frigoletto testified he believed Cappola linked the PMA checking account "erroneously or for whatever the reason . . . to two other existing accounts probably in an effort to get some sort of store credit or something they do in a community bank for opening accounts." He noted, although the PMA Package statement listed POD Thomas, the PMA statement had actually "tagged two accounts . . . that [Thomas] wasn't listed as payable on death on." He further stated Cappola lacked the authority to change the beneficiaries on pre-existing accounts. According to Frigoletto, decedent never executed a change of beneficiary designation granting Thomas the IRA. However, he conceded decedent never attempted to remove the POD designation from the PMA Package, and said it was possible decedent could have spoken to Cappola about changing the beneficiary designation.

Mark claimed that in early 2013, decedent said he desired to grant Thomas "less of a specific bequest through his Estate and

more outside of his Estate." Thomas similarly claimed that decedent intended to leave him approximately $1,000,000, as demonstrated by his "attempt to designate certain bank accounts as POD Thomas Arnold." Thomas therefore requested a declaration "that the three accounts located in the Private Banking PMA Package with account numbers [xxxx-]3249, [xxxx-]5162 and [xxxx-]4068 were intended by the decedent . . . to be gifted to Thomas Arnold outside his will and trust associated with the will."

Conversely, respondents contended Cappola "erroneously" linked checking account xxxx-4068 to one of decedent's IRA accounts. They further asserted that notwithstanding this error, decedent's October 4, 2012 Beneficiary Designation form, the last version decedent executed prior to his death, governed the beneficiaries of his IRA accounts.

Addressing the parties' arguments from the bench at the motion hearing, the judge found the PMA Package statements designating POD Thomas

> did nothing to alter the ownership or beneficiary designation on either Dr. London's Wells Fargo IRA accounts and other accounts. So the statement itself makes it clear that [Thomas] had not been designated as POD beneficiary on the account. And all the testimony is clear to the [c]ourt that those three accounts were for the specific purpose . . . of making [Thomas] the POD beneficiary of a certain account, not the brokerage account 3249.

She next addressed the October 4, 2012 Beneficiary Designation form, which plaintiffs argued should not control because it stated "account" instead of "accounts," and did not identify specific account numbers. The judge found:

> It's signed and witnessed. It had a date, 10/4/2012. It's signed by Merritt London and it is witnessed by Stephen Oppenheim. And that was the last designation that Dr. London made.
>
> The [c]ourt finds that the absence of account numbers are not fatal to the beneficiary designation forms. That Dr. London, between June 2010 and October 2012 used the forms given to him by Wells Fargo. The specific form prescribed by Wells Fargo was utilized in every instance, there were attachments to it, each was received by Wells Fargo and Mr. Frigoletto of Wells Fargo helped Mr. Oppenheim and [decedent] prepare them.
>
> [N.J.S.A. 17:16I-6] does not require that the account numbers be specified on the written notice or order, so I find that the technical requirements of the statute have been fully complied with. Each of those beneficiary designation forms were executed. There is no room for doubt that Dr. London intended both of his IRA accounts to be governed . . . thereby.
>
> The forms were prepared by Dr. London's attorney as part of his estate plan and they were incorporated by and — the forms were provided by Wells Fargo. Wells Fargo representative Anthony Frigoletto actively was involved in the process which led to the change of beneficiary forms.

Finally, addressing plaintiffs' argument that the First Union beneficiary form should control, the judge stated:

28                                                  A-4693-14T4

> It is clear to the [c]ourt that the beneficiary forms of First Union Bank do not apply in this case. . . . We have no idea what exactly happened to those accounts, whether they were changed. And even if they are the same accounts that were there in many, many years ago, they have now been changed over the years by Dr. London.
>
> It is clear to the [c]ourt that Dr. London sought to change his beneficiaries. He did it on numerous occasions. . . . It would be unclear or be improbable that Dr. London would, after making all these changes in beneficiaries over those months from 2010 to 2012, would think that his original designation many, many years ago at First Union Bank[,] which no longer exists apply.

Now on appeal, Thomas argues the judge erred as a matter of law by applying N.J.S.A. 17:16I-6, which is not applicable to IRA accounts, instead of N.J.S.A. 3B:30-1 to -12, which governs IRAs. Furthermore, both plaintiffs and Thomas argue the judge erred by misinterpreting the facts to favor respondents.

We first address Thomas's statutory argument. In rendering her decision, the judge applied the Multiple-party Deposit Account Act (MDPA), N.J.S.A. 17:16I-1 to -17. The MDPA defines "[a]ccount[s]" as "contract[s] of deposit of funds between a depositor and a financial institution," which includes checking and savings accounts. N.J.S.A. 17:16I-2(a). It defines "multiple-party account[s]" to include "(1) a joint account, (2) a P.O.D. account, or (3) a trust account." N.J.S.A. 17:16I-2(e). The MDPA outlines formal requirements for altering account beneficiaries:

The provisions of section 5 as to rights of survivorship are determined by the form of the account at the death of a party. This form may be altered by written notice or order given by a party to the financial institution to change the form of the account or to stop or vary payment under the terms of the account. The order or request must be signed by a party, received by the financial institution during the party's lifetime, and not countermanded by other written order of the same party during his lifetime.

[N.J.S.A. 17:16I-6.]

A different statute, the Uniform TOD Security Registration Act (UTSRA), N.J.S.A. 3B:30-1 to -12, applies to "[s]ecurity account[s]," which include "a cash balance in a brokerage account . . . or a brokerage account." N.J.S.A. 3B:30-2. Importantly, the UTSRA contains no formal requirement for changing a beneficiary, instead providing: "A registration of a security in beneficiary form may be cancelled or changed at any time by the sole owner or all then surviving owners, without the consent of the beneficiary." N.J.S.A. 3B:30-7. The act further urges liberal construction, and allows courts to use "the principles of law and equity [to] supplement its provisions." N.J.S.A. 3B:30-12.

A review of the statements for the decedent's IRA, xxxx-3249, show it is a brokerage account dependent on mutual funds, which suggests the UTSRA applies here as well. Thomas further asserts that the dispute in this case does not concern multiple-party deposit accounts but "individually owned security accounts."

30                                              A-4693-14T4

Nonetheless, we need not make an ultimate determination on this issue, as we reach the same conclusion under either statute.[3] First, the judge correctly determined the October 2012 beneficiary form met the formal requirements of N.J.S.A. 17:16I-6. Second, there is no evidence decedent effected a beneficiary change of IRA xxxx-3249 to satisfy N.J.S.A. 3B:30-7. Review of the entire PMA Package shows the POD Thomas designation referred to the PMA Premier Checking Account only. Even if decedent actually intended to link the accounts, there is no evidence he ever designated Thomas as a beneficiary of IRA account xxx-3249. Given the lack of evidence to the contrary, the principles of equity do not require a different result. N.J.S.A. 3B:30-12.

We reject plaintiffs' and Thomas's remaining arguments, substantially for the reasons expressed by the motion judge. The October 2012 beneficiary form, which states "account" in the singular and does not list account numbers, does not change the result. We conclude the form applies to both of decedent's IRA accounts, which he devised to the charitable organizations. Furthermore, the judge correctly found that the First Union forms, designating plaintiffs as the beneficiaries of different IRA

---

[3]   We have the authority to affirm the lower court "for reasons other than those expressed by the judge." Price v. N.J. Mfrs. Ins. Co., 368 N.J. Super. 356, 359 n.1 (App. Div. 2004), aff'd, 182 N.J. 519 (2005).

A-4693-14T4

accounts, were not sufficient to entitle plaintiffs to decedent's second IRA account. Based on the evidence in the record, any claims regarding decedent's intent to leave Arnold money outside of his estate do not alter our conclusions. In summary, we are satisfied the motion judge did not err by granting summary judgment in favor of respondents. Any arguments not explicitly addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION